954 F.2d 601
 34 ERC 1617, 34 ERC 1679, 22 Envtl.
L. Rep. 20,768
 BRODERICK INVESTMENT COMPANY, a partnership and successor to
Broderick Wood Products, Inc.; the Colorado National Bank
of Denver as trustee; and the First Interstate Bank of
Denver, N.A., as trustee, Plaintiffs-Appellees,
v.
The HARTFORD ACCIDENT & INDEMNITY COMPANY, Defendant-Appellant.
 No. 90-1112.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 8, 1992.
Order on Grant of Rehearing and Denial of Suggestion for Rehearing
En Banc April 15, 1992.
 
 Thomas L. Roberts (Susan T. Smith and Joanne M. Zboyan, of Pryor, Carney & Johnson, P.C., with him on the briefs), of Pryor, Carney & Johnson, P.C., Englewood, Colo., for defendant-appellant.
 Brooke Jackson (Camron R. Kuelthau, of Holland & Hart, Denver, Colo., and Elizabeth A. Phelan, Dubofsky & Phelan, Boulder, Colo., with him on the briefs), of Holland & Hart, Denver, Colo., for plaintiffs-appellees.
 Thomas W. Brunner, James M. Johnstone, and Daniel E. Troy, of Wiley, Rein & Fielding, Washington, D.C., on the brief for Ins. Environmental Litigation Ass'n, amicus curiae.
 Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Daniel S. Miller, First Asst. Atty. Gen., and Charlotte Robinson, Asst. Atty. Gen., Natural Resources Section, on the brief, for State of Colo., amicus curiae.
 William H. Allen and William F. Greaney, of Covington & Burling, Washington, D.C., on the brief for The American Fiber Mfrs. Ass'n, The American Petroleum Institute, The Chemical Mfrs. Ass'n, The Colorado Mining Ass'n, Allied-Signal, Inc., Intern. Business Machines Corp., and Olin Corp., amici curiae.
 Before TACHA and SETH, Circuit Judges and BRATTON, District Judge.*
 TACHA, Circuit Judge.
 
 I. Introduction
 
 1
 This diversity action presents several questions concerning the availability of coverage under the Comprehensive General Liability (CGL) insurance policy for environmental response costs sought by the Environmental Protection Agency (EPA) pursuant to the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq., and the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq.[1]
 
 
 2
 On appeal, appellants challenge the district court's legal rulings on the following issues: (1) the interpretation of the term "occurrence" in the CGL policy; (2) the interpretation of the phrase "sudden and accidental" in the pollution exclusion clause; (3) the applicability of the pollution exclusion; (4) the interpretation of the term "damages"; (5) the interpretation of the "owned property" exclusion; and (6) the award of attorneys' fees in favor of the insured.
 
 
 3
 We review the district court's rulings on these questions of Colorado contract and insurance law de novo. Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). We must interpret the insurance contract as a Colorado court would. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
 
 II. Factual Background
 
 4
 Broderick Wood Products, Inc. (BWP) was formed in 1946. Its founder, William Broderick, placed the stock in trusts administered by the Colorado National Bank of Denver and what is now the First Interstate Bank of Denver (collectively, the trustees). The company ceased operations in 1981 and was dissolved in 1982. Broderick Investment Company (BIC), a limited partnership whose general partners are the two bank trustees, succeeded to the company's rights and obligations.
 
 
 5
 BWP's business involved pressure-treating wood products such as telephone poles and railroad ties with either creosote or pentachlorophenol; steam-cleaning the impregnated wood; and disposing of the residue chemicals, oils, and water. BWP disposed of these waste materials into what today would be considered unlined pits located on the plant property. The waste materials were ninety-eight percent water, which was expected to evaporate and leave a sludge on the pit bottom.
 
 
 6
 By mid-1983, it was conclusively determined that contaminants from the pits were seeping into the soil and groundwater. The BWP facility was eventually added to the National Priorities List of hazardous waste sites under CERCLA. 49 Fed.Reg. 37070, 37085 (Sept. 21, 1984).
 
 
 7
 In April 1985, the EPA threatened to file a lawsuit against BIC and the trustees under CERCLA and RCRA unless the parties could agree to a consent decree. After several months of negotiations, the EPA and BIC agreed to a pretrial consent decree whereby BIC would pay for a study to investigate the contamination and possible solutions. On February 28, 1986, the EPA filed suit against BIC and the trustees, seeking recovery of environmental response costs incurred and to be incurred in association with the cleanup of the BWP facility.[2]
 
 
 8
 On June 6, 1986, one of the trustees' general liability carriers, United States Fidelity & Guaranty, filed this diversity action in the United States District Court for the District of Colorado, seeking a declaration that the CGL policies it had issued to the trustees provided no coverage for response costs sought by the EPA. The named defendants included BIC, the trustees, and other general liability carriers, including Hartford Accident & Indemnity Company. Hartford provided BWP with CGL policy coverage from 1976 until 1982 and insured BIC from 1982 until 1984. BWP's prior insurers were either insolvent or unidentifiable. BIC cross-claimed against Hartford for coverage. Hartford counterclaimed for a declaration of no coverage and cross-claimed against the other carriers for contribution. BIC settled with the trustees' insurers prior to trial. The court then realigned the parties, naming BIC and the trustees as plaintiffs and Hartford as defendant.[3]
 
 
 9
 Prior to trial, the district court interpreted disputed terms of the CGL policy after receiving briefs, argument, and short evidentiary presentations concerning the intent of the policy drafters. The jury instructions and special verdict form reflected these legal rulings. The jury returned a verdict in favor of BIC based on the responses to the questions in the special verdict form.
 
 
 10
 Following the trial, the court awarded BIC attorneys' fees under the policy provision stating the insurer would pay "reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation or defense of any claim or suit." The court also interpreted the 1983 policy to provide coverage of $3 million per occurrence and the other policies to provide coverage of $1 million per occurrence.
 
 
 11
 The CGL policy provides coverage for legal liability for damages imposed upon the insured as a result of an "occurrence." The policy defines an occurrence as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Assuming the insured's loss resulted from an occurrence, the insurer may avoid paying out on the policy if the event falls within the policy's pollution exclusion. This provision excludes coverage for damages "arising out of the discharge, dispersal, release or escape of ... pollutants into or upon land." Coverage is restored, however, if "such discharge, dispersal, release or escape is sudden and accidental."
 
 
 12
 Because our decision necessarily would implicate unique matters of Colorado law and because the Colorado Supreme Court was in the process of addressing the CGL exclusion clause in a case before it, we waited to decide our case until the Colorado Supreme Court announced its decision. In Hecla Mining Co. v. New Hampshire Ins. Co., 811 P.2d 1083 (Colo.1991), the Colorado Supreme Court addressed the meaning of the phrase "property damage neither expected nor intended from the standpoint of the insured," which is part of the policy's definition of the term "occurrence." The court interpreted that phrase to exclude only property damages that "the insured knew would flow directly and immediately from its intentional act." Id. at 1088. The Colorado Supreme Court then addressed the meaning of the phrase "sudden and accidental." It construed "sudden and accidental" to mean unexpected and unintended. Id. at 1092.
 
 
 13
 Although the Hecla decision resolved some issues before this court, it left unresolved two critical issues that we must address--namely, whether the placement of waste materials into containment ponds constituted a "discharge, dispersal, release or escape" and, if so, whether property damage could be said to arise out of this "discharge, dispersal, release or escape." Realizing that the resolution of these issues depended entirely on highly specific and complex matters of contract interpretation under Colorado law, we certified the following question to the Colorado Supreme Court:
 
 
 14
 For purposes of interpreting a pollution exclusion in a comprehensive general liability policy, does the placement of industrial wastes into unlined storage pits when the insured did not intend third party damage to result constitute a "discharge, dispersal, release, or escape" within the meaning of the exclusion such that the damage can be said to "arise out of" the disposition of wastes in the pits?
 
 
 15
 The Colorado Supreme Court refused to answer the question.
 
 
 16
 Therefore, we now must proceed to resolve these two unique and dispositive questions of state law as we believe the Colorado Supreme Court would. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.
 
 
 17
 III. The Interpretation of the Term "Occurrence" in the CGL Policy
 
 
 18
 Before addressing issues related to the pollution exclusion clause, we first examine the district court's jury instructions regarding whether there was an "occurrence." When reviewing a challenge to jury instructions, "we review the record as a whole to determine whether the instructions 'state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable.' " Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1271 (10th Cir.1988) (quoting Ramsey v. Culpepper, 738 F.2d 1092, 1098 (10th Cir.1984)). The CGL policy provides coverage for legal liability for damages imposed upon the insured as a result of an "occurrence." The policy defines "occurrence" as an "accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
 
 
 19
 To determine whether BIC is entitled to coverage for response costs, the jury was required to first determine whether there had been an occurrence. The district judge instructed the jury in the following manner:
 
 
 20
 In order to establish that there is no coverage under its policies, defendant has the burden of proving by a preponderance of the evidence that plaintiffs expected or intended property damage, i.e. that plaintiffs expected or intended to contaminate groundwater or adjoining property. For purposes of this determination, it does not matter what another person might have expected or intended in similar circumstances. You must decide what plaintiffs actually expected or intended.
 
 
 21
 One cannot, however, avoid the consequences of conduct from being expected or intended merely by choosing to ignore that which is obvious.
 
 
 22
 Based on the evidence at trial, the jury determined that BIC did not expect or intend the resulting contamination when it deposited the waste materials in the pits. It concluded there had been an occurrence within the meaning of the policy.
 
 
 23
 The instruction directing the jury to apply a subjective standard in determining whether BIC expected or intended the contamination resulting from its disposal practices is consistent with the Colorado Supreme Court's recent ruling in Hecla. In Hecla, the State of Colorado filed suit under CERCLA against Asarco, Inc., Resurrection Mining Company, and the Res-Asarco Joint Venture for response costs associated with damages resulting from the contamination of the California Gulch. This contamination occurred when Asarco employees removed shoring timbers and accumulated debris from a drainage tunnel, causing a surge of contaminated water. Id. at 1085.
 
 
 24
 The defendants filed a third-party complaint against Hecla Mining Company, a prior owner of a one-third interest in Resurrection. Hecla asked its insurance carriers to provide a defense. The insurance companies filed a declaratory judgment action and claimed they had no duty to defend or indemnify Hecla. They contended the contamination was a reasonably foreseeable result of the use of the drainage tunnel and therefore was not an "occurrence" under the terms of the CGL policy. Id. at 1087.
 
 
 25
 The Colorado Supreme Court rejected this argument. The court held that "the phrase 'neither expected nor intended' should be read only to exclude those damages that the insured knew would flow directly and immediately from its intentional act." Id. at 1088 (emphasis added) (citing City of Johnstown v. Bankers Standard Ins. Co., 877 F.2d 1146, 1150 (2d Cir.1989); see also Brooklyn Law Sch. v. Aetna Casualty & Sur. Co., 849 F.2d 788, 789 (2d Cir.1988)). Because there was no evidence Hecla actually knew impounding water in the drainage tunnel would cause environmental damage, the court concluded the contamination "must be deemed an occurrence under the terms of the CGL policies." Id.
 
 
 26
 Based on this holding, we reject Hartford's argument that the district court erred in instructing the jury to apply a purely subjective standard in determining whether BIC expected or intended the contamination resulting from its disposal practices. Under Colorado law, environmental contamination constitutes an occurrence unless the evidence proves the insured in fact knew at the time that its practices would result in such damage. The district court properly assigned Hartford the burden of proving BIC knew its disposal practices would cause environmental damage. Because the district court properly instructed the jury, we do not disturb the jury's determination that there was an "occurrence."
 
 
 27
 IV. The Applicability of the Pollution Exclusion Clause
 
 
 28
 We must follow Colorado law when interpreting the CGL policy at issue in this case. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); City of Aurora v. Bechtel, 599 F.2d 382, 386 (10th Cir.1979). Under Colorado law, the plain language of the contract controls, and a court cannot torture the plain language in order to create ambiguities. Chacon v. American Family Mut. Ins. Co., 788 P.2d 748 (Colo.1990); Northern Ins. Co. v. Ekstrom, 784 P.2d 320, 322 (Colo.1989). The Colorado Supreme Court has held that "[a] provision in a policy is ambiguous when it is reasonably susceptible to more than one meaning." Ekstrom, 784 P.2d at 323. Any ambiguities in a policy must be construed against the insurer. Further, when there are two or more reasonable interpretations of a clause, a court must adopt an interpretation that provides coverage. Chacon, 788 P.2d at 750; Republic Ins. Co. v. Jernigan, 753 P.2d 229, 232 (Colo.1988). In summary, "[t]o benefit from an exclusionary provision in a particular contract of insurance the insurer must establish that the exemption claimed applies in the particular case and that the exclusions are not subject to any other reasonable interpretations." American Family Mut. Ins. Co. v. Johnson, 816 P.2d 952, 953 (Colo.1991) (citing Hecla, 811 P.2d at 1090).
 
 
 29
 On appeal, we must determine whether the pollution exclusion clause contained in the CGL policy relieves Hartford of its coverage obligations. The exclusion provision states,
 
 
 30
 This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
 
 
 31
 On October 4, 1990, the district court ruled that the phrase "discharge, dispersal, release or escape" applied only to the seepage of chemicals from the holding pond into the groundwater, and not to the placement of wastes into the holding pond. Further, the jury instructions--immediately after quoting the language of the exclusion--provided that "[y]ou are instructed that the phrase 'discharge, dispersal, release or escape' applies to the entry of the chemicals into the groundwater." Finally, the jury verdict form focused only on the seepage of the toxic chemicals from the holding ponds into the groundwater.
 
 
 32
 We must determine whether the district court committed reversible error by instructing the jury to focus on the seepage from the holding ponds into the groundwater and by holding that the exclusion clause found in the CGL policy did not apply to the initial discharge. To make this determination, we must decide whether the initial placement of toxic chemicals into the holding ponds constituted a "discharge, dispersal, release or escape" into the land. Under Colorado law, we must construe these words according to their plain and ordinary meaning. "When determining the plain and ordinary meaning of words, definitions in a recognized dictionary may be considered." Hecla, 811 P.2d at 1091.
 
 
 33
 Relying on dictionary definitions, BIC contends that these four words generally imply liberation or freedom from confinement or restraint. BIC then argues that it intended to contain the wastes in the containment ponds, not to allow the wastes to seep into the groundwater. Because the pollution exclusion clause utilizes the word "or" to connect these four words, the exclusion is triggered if even one of the four words unambiguously describes BIC's placement of waste into the ponds. We conclude that, applying any reasonable interpretation, the phrase "discharge ... into or upon the land" describes BIC's placement of waste into the ponds.
 
 
 34
 BIC urges that the term "discharge" may be interpreted reasonably to mean "to let go," "release from confinement" or "to give outlet to."[4] The term "discharge" does not stand alone in the policy and must be read in the context of the remainder of the language of the clause; most significantly, the term "discharge" precedes the phrase "into or upon the land." Even when we employ BIC's definitions in place of the word "discharge," we conclude that BIC discharged--or "let go" or "released from confinement"--the waste "into or upon the land."[5] Because the containment ponds are land, any other interpretation of the phrase "discharge ... into or upon the land" runs counter to common sense, plain meaning, and ordinary usage.
 
 
 35
 BIC argues that it intended to contain the waste in the ponds and that the subsequent release or escape that contaminated the groundwater was not intended or expected. With this argument, BIC tries to shift the focus to the second discharge and attempts to graft an intent requirement related to damages onto the unambiguous language of the policy's exclusion clause. However, whether BIC intended the waste to seep into groundwater and cause damage after the initial discharges into the land is not relevant. "[T]he pollution exclusion clause focuses on whether the discharge of pollution was unexpected and unintended." Hecla, 811 P.2d at 1088 n. 7 (emphasis added). We cannot torture the unambiguous language of the exclusion provision in order to create an intent requirement that applies to the damage caused by the pollutants.
 
 
 36
 Because we conclude that BIC discharged its waste into the land, we must decide whether the property damage arose out of that discharge. In Azar v. Employers Casualty Co., 178 Colo. 58, 495 P.2d 554, 555 (1972), the Colorado Supreme Court defined "arising out of" to mean "originate from," "grow out of" or "flow from." The Colorado Supreme Court has stated that "[w]e see no reason to give 'arising out of' a different meaning in the context of a policy exclusion." Northern Ins. Co. v. Ekstrom, 784 P.2d 320, 323 (Colo.1989). Whether the phrase "arising out of" in an insurance exclusion clause bars coverage is determined under a "but for" analysis. See Titan Constr. Co. v. Nolf, 515 P.2d 1123, 1126 (Colo.1973). Given the facts in this case, we conclude that the contamination of the groundwater could not have occurred but for BIC's discharge into the holding ponds. Without the discharge into the holding ponds, the resulting groundwater contamination simply would not have developed. Thus, the property damage originated from, grew out of, and flowed from BIC's discharge of toxic chemicals into the holding ponds.
 
 
 37
 Under the exclusion clause, coverage is restored if the discharge was "sudden and accidental." The Colorado Supreme Court recently stated that the term "sudden and accidental" is ambiguous and must be construed in favor of the insured to mean "unexpected and unintended." See Hecla, 811 P.2d at 1092. Employing this construction, we conclude that the record shows that the initial discharge into the ponds was not "sudden and accidental." BIC admits that it intended to discharge the toxic chemicals into the ponds and that such a discharge was not unexpected. Therefore, we conclude that the pollution exclusion clause applies and the property damage arising out of BIC's discharge into the land is not covered under the unambiguous terms of the CGL policy. This conclusion makes it unnecessary for us to reach the remainder of Hartford's contentions on appeal.
 
 
 38
 In making this determination, we emphasize that our reasoning and interpretation are governed by Colorado law. We can only analyze the CGL policy as we think the Colorado Supreme Court would have done had they accepted our certification. The parties and the amicus curiae briefs raise extremely important policy concerns regarding the interpretation of the CGL exclusion clause. However, under Colorado law, we must confine our analysis of the exclusion clause to the plain language of the contract. We conclude that the language is clear and unambiguous.
 
 
 39
 Accordingly, we REVERSE the judgment of the district court, 742 F.Supp. 571, and REMAND for further proceedings consistent with this opinion.
 
 ORDER ON REHEARING
 
 40
 April 15, 1992.
 
 
 41
 Plaintiffs-Appellees' petition for rehearing is granted by the panel of judges who decided this appeal on the merits. On rehearing, we consider only the issue of whether Broderick Investment Company (BIC) is entitled to coverage for two sources of pollution, the "main pond" and the "plant equipment." In its petition for rehearing, BIC contends that "[t]he proper course--if the panel's opinion is not otherwise modified--is to affirm the finding of coverage as to those two sources and remand for a determination of this allocation" (footnote omitted). We disagree.
 
 
 42
 With regard to the "main pond," we stated in footnote five of our opinion that
 
 
 43
 BIC indirectly suggests that the phrase "into or upon the land" does not describe their disposition of waste because one of the three containment ponds might have been lined with raw cement. As characterized by BIC, the evidence at trial indicated the following: that the pits were dug down to a natural clay layer; that the first pond was lined with two inches of raw cement; that although no one could testify with certainty that cement was placed in the bottom of the first pit, Forrest Dean testified that "he encountered a hard, impenetrable material on the bottom that was as hard as cement"; and that two of the three ponds were not lined with cement. BIC admitted that the pond was unlined as measured by today's EPA standards. In its supplemental brief, BIC asserted that " [t]he main pond was at best partially, and probably entirely, lined with raw cement."[1] Even when we view the evidence in a light most favorable to BIC and adopt BIC's characterizations as true, we nevertheless conclude that the disposition of the waste was "into or upon the land."
 
 
 44
 BIC contends that when we made this statement, we were reviewing the "sufficiency of the evidence concerning the cement lining of the main pond." This simply is incorrect. We reemphasize that we adopted all of BIC's characterizations of the evidence as true. We then concluded--as a matter of law--that when BIC placed waste into the main pond, it discharged waste "into or upon the land." We recognize that BIC argues that it intended to contain the waste in the pond. This argument misses the point: BIC still intended to contain the waste in the land. Thus, BIC discharged waste into the land and is not entitled to coverage for any damage that emanated from its discharge of waste into the main pond or any of the other ponds.
 
 
 45
 Turning to whether BIC is entitlied to coverage for the "plant equipment," we begin by examining the district court's instruction regarding the exclusion clause. After quoting the exclusion clause, the district court's instruction stated that "[y]ou are instructed that the phrase 'discharge, dispersal, release or escape' applies to the entry of the chemicals into the groundwater." The jury verdict form also incorrectly focused on the release of toxic chemicals into the groundwater. As we concluded in our earlier opinion, the instruction and the jury verdict form were improper. We cannot accept the jury's finding of coverage with regard to the "plant equipment." Instead, we must remand to the district court for a new trial to determine whether coverage exists for the contamination caused by waste that emanated from the "plant equipment" and for further proceedings consistent with this opinion.
 
 
 46
 Therefore, we now vacate the last sentence of our earlier opinion and substitute the following:
 
 
 47
 In accordance with Rule 35(b), Federal Rules of Appellate Procedure, the suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service. No member of the panel and no judge in regular active service on the court having requested that the court be polled on rehearing en banc, Rule 35, Ferderal Rules of Appellate Procedure, the suggestion for rehearing en banc is denied.
 
 
 48
 BIC's motion for recertification to the Colorado Supreme Court also is denied.
 
 
 
 *
 The Honorable Howard C. Bratton, Senior District Judge for the United States District Court for the District of New Mexico, sitting by designation
 
 
 [1]
 Between 1971 and 1986, virtually all insurance companies issued an identical standard-form CGL insurance contract produced by the National Bureau of Casualty Underwriters and the Mutual Insurance Rating Bureau. Thus, the same contract language is at issue in nearly all insurance litigation pertaining to the years 1971 to 1986
 
 
 [2]
 CERCLA identifies the owner or operator of a facility as a party potentially responsible for environmental response costs associated with the cleanup of that facility. 42 U.S.C. § 9607(a)(1). A facility's prior owner or operator may also be held liable if hazardous substances were disposed at the facility during that person's ownership or operation of the facility. 42 U.S.C. § 9607(a)(2). The EPA therefore sought recovery from BIC because it was both the current owner of the BWP facility and also the corporate successor to the facility's prior owner, BWP. See United States v. Carolina Transformer Co., Inc., 739 F.Supp. 1030, 1039 (E.D.N.C.1989) (successor corporation liable under CERCLA if "substantial continuity" test satisfied)
 CERCLA does not clearly define who may qualify as an owner or operator of a facility. See 42 U.S.C. § 9601(20)(A) (definition of "owner or operator"). Courts have held that a person who is directly involved in the management of a facility may be liable as an owner or operator. See, e.g., New York v. Shore Realty Corp., 759 F.2d 1032, 1052-53 (2d Cir.1985). Based on this construction, the EPA sought recovery against the trustees because they had served on BWP's board of directors, continually monitored BWP's performance, and made or reviewed the company's management decisions. The issue of BIC's successor liability is not before us.
 
 
 [3]
 For the sake of clarity, the plaintiffs-appellees shall be collectively referred to as "BIC" throughout the remainder of this opinion
 
 
 [4]
 We note that, among many possible definitions, "discharge" may also be interpreted to mean "to send forth" or "to emit." See Compact Edition of the Oxford English Dictionary 740-41 (1985). These two definitions also support our interpretation of the exclusion clause
 
 
 [5]
 On appeal, BIC indirectly suggests that the phrase "into or upon the land" does not describe their disposition of waste because one of the three containment ponds might have been lined with raw cement. As characterized by BIC, the evidence at trial indicated the following: that the pits were dug down to a natural clay layer; that the first pond was lined with two inches of raw cement; that although no one could testify with certainty that cement was placed in the bottom of the first pit, Forrest Dean testified that "he encountered a hard, impenetrable material on the bottom that was as hard as cement"; and that two of the three ponds were not lined with cement. BIC admitted that the pond was unlined as measured by today's EPA standards. In its supplemental brief, BIC asserted that "[t]he main pond was at best partially, and probably entirely, lined with raw cement." Even when we view the evidence in a light most favorable to BIC and adopt BIC's characterizations as true, we nevertheless conclude that the disposition of the waste was "into or upon the land."
 
 
 [1]
 BIC subsequently corrected this sentence to read "[t]he main pond was at least partially, and probably entirely, lined with raw cement." This change in no way affects our analysis because, for purposes of resolving this appeal, we accepted BIC's version of the evidence as true