**UNITED STATES of America, Plaintiff,**

v.

**SUMMIT EQUIPMENT & SUPPLIES, INC., et al., Defendants,**

v.

**GENERAL MOTORS, et al., Third–Party Defendants.**

No. 5:90CV1704.

United States District Court, N.D. Ohio, E.D.

July 21, 1992.

Memorandum and Order on Denial of Reconsideration Sept. 13, 1992.

**1424**

Michael A. Jeter, Office Of The U.S. Atty., Cleveland, Ohio, Colin C. Carriere and Peter Colby, Dept. of Justice, Environment & Natural Resources Div., Environmental Enforcement Section, Washington, D.C., for plaintiff U.S.

Brent L. English, Cleveland, Ohio, Susan R. Squire, Thomas M. Parker, Roetzel & Andress, Akron, Ohio, Laurence H. Levine, Cary R. Perlman, Latham & Watkins, Chicago, Ill., Peter J. McCabe, Louis E. Tosi, Douglas G. Haynam, Fuller & Henry, Toledo, Ohio, David S. Hoffmann, City Of Cleveland Dept. Of Law, Cleveland, Ohio, for defendants.

Charles R. McElwee, Kathiann M. Kowalski, Squire, Sanders & Dempsey, Cleveland, Ohio, David E. Nash, Daniel W. Hammer, Sr., Michael L. Hardy, Walt Addison Linscott, Thompson, Hine & Flory, Cleveland, Ohio, for third-party defendants.

Peter J. McCabe, Louis E. Tosi, Douglas G. Haynam, Fuller & Henry, Toledo, Ohio, for counter-claimant.

Louis E. Tosi, Douglas G. Haynam, Fuller & Henry, Toledo, Ohio, Robert J. Peterson, Park Corp., Cleveland, Ohio, Peter J. Veeder, Randolph T. Struck, Thorp, Reed & Armstrong, Pittsburgh, Pa., Anthony Siciliano, Fleck, Mostov & Schwartz, Youngstown, Ohio, Donald Klingenberg, Painesville, Ohio, Kurt R. Weitendorf, Timothy J. Truby, Robert Franklin Orth, Roderick, Myers & Linton, Akron, Ohio, Joseph A. Strubbe, Pope & John, Chicago, Ill., Keven Drummond Eiber, Brouse & McDowell, Akron, Ohio, Brian D. Kerns, Cronquist, Smith, Marshall & Weaver, Brent L. English, Cleveland, Ohio, Mary K. Braza, Foley & Lardner, Milwaukee, Wis., Daniel F. Gourash, Porter, Wright, Morris & Arthur, Cleveland, Ohio, James V. Maher, Allied-Signal, Inc., Law Dept., Morristown, N.J., Mary M. Bittence, William W. Falsgraf, Sr., Baker & Hostetler, Cleveland, Ohio, William E. Coughlin, David James Carney, Kevin P. Hallquist, Calfee, Halter & Griswold, Cleveland, Ohio, Henry D. Nelkin, Theodore H. Rosenblatt, Bivona & Cohen, New York City, Christopher A. Keele, Michael McCluggage, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Alton L. Stephens, Jr., Virginia L. Reichard, Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, Edward J. Cass, Gallagher, Sharp, Fulton & Norman, Cleveland, Ohio, Matthew T. Fitzsimmons, III, Nicola, Gudbranson & Cooper, Cleveland, Ohio, F. Lane Heard, III, Cherry Joy Beysselance, Williams & Connolly, Washington, D.C., Sharon Lynn Donohue, Rosenzweig, Schulz & Gillombardo, Cleveland, Ohio, Margaret A. Hill, Robert M. Rader, Tracy M. Getz, Winston & Strawn, Washington, D.C., Gregory R. Lyman, Singleton, Levy & Christ, Munster, Ind., Charles R. McElwee, Squire, Sanders & Dempsey, Cleveland, Ohio, Alan S. Kopit, R. Steven Degeorge, Hahn, Loeser & Parks, Cleveland, Ohio, Erica Tina Helfer, Oak Brook, Ill., for third-party defendants.

Gregory H. Collins, Martin J. Murphy, Davis & Young, Cleveland, Ohio, for third-party defendant, National Twist Drill Co.

William E. Coughlin, David James Carney, Kevin P. Hallquist, Calfee, Halter & Griswold, Cleveland, Ohio, for Cleveland Steel Container Corp. counter-claimant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The United States brings this action under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), to recover costs incurred during a hazardous waste remedial action at the Summit Equipment Supplies, Inc. ("SES") facility in Akron, Ohio. The United States has sued six primary defendants: SES, Benjamin Hirsch, Michael Hirsch, Owens–Illinois, Inc. ("Owens"), Navistar Transportation Corporation ("Navistar"), and the city of Cleveland ("Cleveland").

The United States has moved for summary judgment against all of these defendants, except for Michael Hirsch, on the question of liability under CERCLA. Michael Hirsch, Owens, Navistar, and Cleveland, in turn, have moved for summary judgment against the United States on the same question. For the reasons that follow, the government's motions for sum-

mary judgment are granted, Michael Hirsch's motion for summary judgment is granted, and the summary judgment motions of Navistar, Cleveland, and Owens are denied.

## I.

The undisputed facts of this case construed in the light most favorable to the defendants are as follows. SES is a scrap metal processing and storage facility located north of 875 Ivor Avenue in Akron, Ohio. Most of the scrap metal purchased by SES was already in the form of scrap and was simply stored until resold. However, SES also obtained some scrap metal through the purchase of used industrial equipment, motors, transformers, copper wire, lead cables, car batteries, and munitions shells in order to salvage their steel and copper components. Only occasionally would SES resell the used equipment intact, (an estimated 2–3% of its entire sales). For the most part, however, SES scrapped the equipment and resold only the metal that had been salvaged.

On July 31, 1986, the Ohio Environmental Protection Agency Office of Emergency Response ("OEPA/OER") conducted a compliance inspection at the SES site after it had received a complaint from the Akron police department about the operations there. OEPA/OER conducted tests that revealed that the soil contained polychlorinated biphenyls (PCBs). In October 1986, OEPA/OER advised SES of the PCB contamination and recommended remedial action. On February 3, 1987, after concluding SES would not remedy the situation on its own, OEPA/OER requested the assistance of the EPA to evaluate and remedy site conditions.

The U.S. EPA sent the Region V Technical Assistance Team ("TAT") to conduct a further inspection of the SES site. Ralph Dollhopf acted as the On–Scene Coordinator ("OSC"). When Dollhopf and TAT visited the site in February and March, 1987, they found site conditions that prompted them to believe that a release or threatened release of hazardous substances had occurred. As a result, the U.S. EPA Region V Administrator authorized an emergency remedial action, pursuant to CERCLA § 104(a)(1), 42 U.S.C. § 9604(a)(1), to mitigate the imminent threat to public health and the environment posed by the presence of hazardous substances at the site. The primary objectives of the remedial action were to (1) stabilize site conditions and thereby minimize the likelihood of ongoing and future releases; and (2) evaluate the extent of both on and off-site contamination.

The clean-up began on March 10, 1987 and was completed by September 29, 1987. The U.S. EPA contracted with MAECORP, Inc. and Roy F. Weston, Inc. ("Weston") to conduct the removal services at the site. Weston also assisted the OSC in evaluating the extent of contamination. As reflected in the extent of contamination report ("EOC report") prepared by Weston, numerous tests of the soil and groundwater at the SES site revealed extensive contamination. The soil was contaminated with hazardous substances including: PCBs, copper, lead, cadmium, nickel, mercury, zinc, dioxin, and chlorinated furans. Furthermore, the groundwater was contaminated with PCBs, zinc, nickel, and cadmium. In accordance with EPA regulations, Dollhopf prepared another report ("the OSC report") that summarized the response actions taken at the SES site.

In total, the U.S. EPA incurred approximately $600,000 in costs due to this emergency remedial action. In order to recover the response costs and to obtain a declaration of liability for future response costs, the United States filed this action under CERCLA, 42 U.S.C. § 9607(a), against SES, its president, Benjamin Hirsch, and one of its employees, Michael Hirsch, as owners and operators of the SES facility. It also sued three principal entities that sold used equipment to SES: Owens, Navistar, and the city of Cleveland.

Owens–Illinois, Inc. is a diversified manufacturer of glass and packaging products. Due to the general recession of the late 1970s and early 1980s, Owens had excess manufacturing equipment that it no longer needed. Because the equipment was still

useable for its original purpose, however, Owens established an elaborate asset recovery program to sell its surplus equipment at public auctions. Benjamin Hirsch attended two of these auctions in 1981 and 1982 and purchased $4,903.00 worth of used equipment. Even though the surplus equipment was still in useable condition, Benjamin Hirsch avers that the equipment was purchased as scrap in order to salvage its copper components.

Like Owens, the recession of the late 1970s and early 1980s also had an adverse effect on Navistar, then known as International Harvester. Like Owens, Navistar reduced its manufacturing capacity, closing certain facilities and selling off the used equipment associated with discontinued manufacturing lines. Two of these manufacturing plants that Navistar decided to close were the West Pullman plant complex in Chicago, Illinois and the Fort Wayne plant in Fort Wayne, Indiana. After selling the physical plant and transferring some of the equipment and machinery to other plants within the company, Navistar held public auctions to sell the remaining equipment. In an effort to secure the best possible price, Navistar marketed its equipment aggressively to *users*. Navistar even took pains to keep the equipment hooked inplace at the facilities so that potential purchasers could confirm that the equipment was still in good working order. Benjamin Hirsch attended both auctions and purchased a small amount of equipment, various grinders and motors that contained salvageable copper.

In the early to mid–1970's, Cleveland decommissioned an electrical generating facility that was part of the Municipal Light and Power Plant. In order to sell seven of the turbo-generators and associated equipment from that plant, Cleveland conducted a sealed-bid auction. The bid invitations included a section entitled "detailed specifications" and subtitled "specifications for the sale, dismantling and removal of surplus and obsolete equipment at E. 53rd St. plant and Lake Rd. plant." In May 1976,

Cleveland awarded the sales contract to Benjamin Hirsch, d/b/a Summit Scrap Iron Co., because Hirsch submitted the highest bid. Prior to submitting his bid, Hirsch inspected the Municipal Light plant and found that the transformers were in "good working shape."

In October, 1975, Hirsch began to remove the used equipment from the Municipal Power Plant. Hirsch was forced to cease these removal activities in late 1976, however, because Cleveland Electric Illuminating Co. expressed an interest in purchasing the equipment for its electrical needs. The sale to CEI never materialized, however. Hirsch finally completed the removal in 1983. Even though Hirsch had contacted a South Dakota company at one time about purchasing the used equipment, he eventually scrapped the equipment in order to salvage its metal parts. This equipment was then removed to the SES site and scrapped. Two of the transformers found at the SES site during the removal action were traceable to the Municipal Light Plant.[1]

Owens, Navistar, and Cleveland are not the only entities that sold used equipment containing hazardous substances to SES. Following the filing of the government's complaint, SES filed a third-party complaint against forty-nine (49) other companies that allegedly sold materials containing hazardous substances to SES. Due to the large number of defendants in this action, this Court trifurcated the proceedings into three phases. Phase I would determine the liability of the primary defendants and the United States. Phase II would determine the liability of all third-party defendants. Finally, in phase III, the Court will assess and allocate responsibility or liability among any and all parties found liable in phases I and II.

In accordance with phase I of this order, the United States has filed a motion for summary judgment against all of the primary defendants, except Michael Hirsch.

1. Benjamin Hirsch also alleges that he purchased between 70 and 100 transformers and lead cable from the city's W. 41st St. electrical station. No records were ever found, however, to verify these transactions.

In addition, the United States has filed a motion to strike the defendants' affirmative defenses and demand for a jury trial. In an effort to establish that they are not liable under CERCLA, Michael Hirsch, Navistar, Owens, and Cleveland have all filed summary judgment motions against the United States as well.

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...

The nature of materials properly presented in a summary judgment pleading is set forth in Federal Rule of Civil Procedure 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512. The fact that the parties have filed cross-motions for summary judgment does not change this standard of review. *Taft Broadcasting v. United States*, 929 F.2d 240, 249 (6th Cir. 1991).

## III.

CERCLA was enacted in 1980 to remedy "the tragic consequences" and "the unfortunate human health and environmental" problems caused by the improper disposal of hazardous substances. H.Rep. No. 1016(I), 96th Cong., 2d Sess. 17 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6120. With "as many as 30,000 to 50,000 uncontrolled hazardous waste sites" in the country as of 1979, Congress recognized that it needed to provide the federal government with "the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal." *Walls v. Waste Resource Corp.*, 823 F.2d 977, 980 (6th Cir.1987).

To enable the government to promptly and effectively respond to emergency situations where the release of hazardous substances presented "an imminent and sub-

stantial danger to the public health or welfare," Congress provided the EPA Administrator the authority to respond with "remedial" or other "removal actions." 42 U.S.C. § 9604(a)(1); *U.S. v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1500 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990). The funding for these remedial actions would initially come from a public trust fund, commonly known as "Superfund." But, because of the large number of expensive cleanups that might be required, Congress created a "comprehensive financing mechanism" that would allow the government to promptly "recover *all* response costs from all persons responsible for the release of hazardous substances." *R.W. Meyer, Inc.*, 889 F.2d at 1500. As the Sixth Circuit explained, "Congress intended that those responsible for the problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions created." *Walls*, 823 F.2d at 980.

Section 107(a) was designed to serve as this financing mechanism. H.Rep. No. 1016(I) at 33, *reprinted in* U.S.Code Cong. & Admin.News at 6136 (The purpose of [section 107(a)] is to provide a mechanism for prompt recovery of monies expended for the costs" of remedial actions.) *Dedham Water Co. v. Cumberland Farms Dairy*, 805 F.2d 1074, 1082 (1st Cir.1986) ("[L]iability provisions of section 107 are an essential part of the structure established by CERCLA because the resources of the Fund alone are simply insufficient to provide an adequate remedy to the national problem of hazardous waste disposal.") Under that section, the government may bring a civil action against responsible parties and recover all of its expenses. These responsible parties include more than just the owners and operators of hazardous waste disposal facilities. They also include "the generators and transporters" of the hazardous substances found at the facility where the release or threatened release occurred. *Dedham Water Co. v. Cumberland Farms Dairy*, 889 F.2d 1146, 1153 (1st Cir.1989). As a relevant Senate report stated:

> In correcting the historic neglect of hazardous substance disposal, it is essential that this incentive for greater care focus on the initial *generators of hazardous wastes* since they are in the best position to control the risks. Generators create the hazardous wastes and know how to avoid them, and they determine whether and how to dispose of these wastes on their own site or at locations controlled by others.

S.Rep. No. 848, 96th Cong., 2d Sess. 15 (1980) (emphasis added).

By spreading the net of liability wide to include the generators and transporters of hazardous waste, Congress ensured sufficient sources for the funds needed to finance the expensive cleanup of hazardous waste sites. Moreover, Congress provided that the expensive costs of these cleanups would not be borne by any one particular defendant, but rather, shared by a large number of defendants who would each pay a much smaller amount of the total cost. *See generally* H.Rep. No. 1016(I) at 34–35, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 6137–6138 (discussing the attempt to establish an apportionment scheme "to induce persons to come forward with as much information as possible with respect to hazardous waste.")

Accordingly, there are four (4) categories of potentially responsible parties who are liable under CERCLA § 107(a) for the costs incurred when the government responds to a release, or a threatened release, of hazardous substances:

(1) the owner and operator of a vessel of a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person ... at any facility ... owned or operated by another party ...,

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ...

42 U.S.C. § 9607(a).

■ In addition to being broad, liability under § 107(a) is strict. *See J.V. Peters & Co., Inc. v. EPA,* 767 F.2d 263, 266 (6th Cir.1985) ("[S]ection 107 imposes a form of strict liability.") This strict liability scheme was imposed so that potentially responsible parties would voluntarily cooperate and not use legal avenues to contest liability and hinder the government's ability to secure prompt recovery of its costs. As one House report explained, "The purpose of [§ 107(a)] is ... to induce ... potentially liable persons to pursue appropriate environmental response actions voluntarily." H.Rep. No. 1016(I) at 33, *reprinted in* U.S.Code Cong. & Admin.News at 6136.

■ Consequently, the government's burden of proof is relatively easy. In order to establish liability, the government is not required to establish that the defendant was at fault or caused the release or threatened release that prompted the remedial action in question. *Dedham Water Co.,* 889 F.2d at 1153. Rather, the government must establish the following elements only:

(1) The SES site is a "facility";

(2) a release or threatened release of a hazardous substance from the SES site has occurred;

(3) the release or threatened release has caused the United States to incur response costs; and

(4) the defendants fall within at least one of four classes of responsible persons described in § 9607(a).

*United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1377 (8th Cir.1989); *see also Dedham Water Co.,* 889 F.2d at 1150; *United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490

U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).[2]

### A. *Owner/Operator Liability*

SES and Benjamin Hirsch have not disputed the fact that they both fall within the category of "owners and operators" of a "facility" as defined by 42 U.S.C. § 9607(a)(1). Moreover, neither disputes the fact that the government has incurred response costs. Rather, they assert that they are not liable because the government has failed to prove the existence of a "release or threatened release" of hazardous substances at the SES site.

This argument is based solely on the contention that Ralph Dollhopf's affidavit, and the EOC and OSC reports on which it is based, are inadmissable hearsay because Dollhopf lacked personal knowledge of the report's factual findings. Federal Rule of Evidence 803(6) provides that documents specified therein are not excluded by the hearsay rule. These documents include:

A memorandum, report, record, or data compilation in any form, of acts, events, conditions ... made at or near the time by, or from information transmitted by, a person with knowledge if kept in the course of a regularly conducted activity, and if it was the regular practice of that business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(6).

■ A party who "played a role in the creation or compilation of the records" is a competent witness. *United States v. Hathaway,* 798 F.2d 902, 906 (6th Cir.1986); *Calhoun v. Baylor,* 646 F.2d 1158, 1162 (6th Cir.1981). In this case, it is clear that

---

**2.** 42 U.S.C. § 9607(b) establishes just four (4) affirmative defenses to this strict liability. Specifically, if a defendant, otherwise liable under subsection (a), establishes that a release or threatened release of hazardous waste was caused solely by an act of God or an act of war, negligence on the part of the United States, or

an act or omission by a third party. With respect to the third party defense, a defendant is also required to establish that he exercised "due care" and took precautions against the foreseeable acts of third parties. Since none of these affirmative defenses have been asserted in this case, they are not relevant to this discussion.

Dollhopf, as the on-scene coordinator, played an important role in the creation and compilation of his own OSC report. Indeed, he was the individual who retained ultimate responsibility for all of the EPA's activities at the SES site. With respect to the EOC report, authentication is provided by Owen B. Douglass, Senior Project Manager of Weston. Douglass was chief coordinator and records custodian for this particular contract. Since the preparation of this report is a "regular business activity" of Weston, the EOC report is admissable under Fed.R.Evid. 803(6) as well.

■ Furthermore, both reports are admissable under Federal Rule of Evidence 803(8)(C), which provides for the admission of "factual findings resulting from investigation made pursuant to authority granted by law." Fed.R.Evid. 803(8)(C). Both reports were made under the direction of the EPA which has authority to take all necessary action to remedy a release, or a threatened release, of hazardous substance. *See United States v. Shaner*, No. 85-1372, 1990 WL 115085, *11 (E.D.Pa., June 25, 1990) (same holding).

■ Rule 803(6) provides for the exclusion of this evidence only "if the source of information or the method or circumstance of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). A similar provision is present in Rule 803(8)(C). The party that opposes the admission of the documents bears the burden of proof on this issue. *In re Japanese Electronics Products Antitrust Litigation*, 723 F.2d 238, 289 (3d Cir.1983). The preparation, source, or content of these reports, however, do not indicate a lack of trustworthiness. They were prepared under authority of law, and are consistent with the remedial actions taken at the site. Accordingly, with the admission of this evidence, there is no genuine issue of material fact that a "release or threatened release" of hazardous substances occurred at the SES facility. As owners and operators of that facility, SES and Benjamin Hirsch are liable under CERCLA as a matter of law.

■ Unlike Benjamin Hirsch, Michael Hirsch contends that he is not an "operator" as defined by Section 107(a)(1) of CERCLA. The government has not opposed his motion for summary judgment on this issue. Indeed, in order to establish operator liability under CERCLA, the government must demonstrate that the individual had sufficient authority over the disposal operations to "prevent or significantly abate" the release of hazardous substances that prompted the lawsuit. *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1554, 1561 (W.D.Mich.1989) (articulating the "prevention" test); *see also United States v. Carolina Transformer Co., Inc.*, 739 F.Supp. 1030, 1036-37 (E.D.N.C.1989) (the dominant consideration appears to be significant participation in the running of the company, especially as it relates to waste disposal.)

■ In this case, the affidavits of Benjamin and Michael Hirsch indisputably establish that Michael Hirsch was not an operator of the SES site. Michael Hirsch was a salaried employee of his father, and merely acted as a buyer of scrap. He did not have an equity share of the company's earnings and he possessed no authority over operations at the SES site. Accordingly, as a matter of law, Michael Hirsch is not liable under CERCLA.

### B. *Generator Liability*

Unlike SES and Benjamin Hirsch, Owens, Navistar, and Cleveland have not contested that the government incurred legitimate response costs to remedy a release or threatened release of hazardous substances at the SES facility. Rather, each defendant contends that they are not liable under CERCLA because they do not fall within the categories of potentially responsible parties contained in section 107(a)(3). As previously discussed, Owens, Navistar, and Cleveland are only liable if they "arranged for disposal or treatment" of hazardous substances at the SES facility. 42 U.S.C. § 9607(a)(3).

"While the legislative history of CERCLA sheds little light on the intended meaning of this phrase, the courts have concluded that a liberal interpretation is consistent

with CERCLA's 'overwhelmingly remedial' statutory scheme." *Aceto Agr. Chemicals Corp.*, 872 F.2d at 1380 (citations omitted); *Florida Power and Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1317 (11th Cir.1990); *Dedham Water Co.*, 805 F.2d at 1081; *United States v. Conservation Chemical*, 619 F.Supp. 162, 184 (W.D.Mo. 1985). Indeed, as the Sixth Circuit has instructed, this Court must "not interpret section 107(a) in any way that apparently frustrates the statute's goals, in the absence of specific congressional intention otherwise." *Walls*, 823 F.2d at 981.

CERCLA was designed to cast a wide net by holding the generators of hazardous substances liable for its disposal. However, as one court explained, "liability for releases under § 9607(a)(3) is not endless; it ends with that party who both owned the waste and made the crucial decision how it would be disposed of or treated, and by whom." *United States v. A & F Materials Co., Inc.*, 582 F.Supp. 842, 845 (S.D.Ill. 1984).[3]

Based on this principle, all three defendants argue that the sale of valuable, useable equipment can never be an arrangement for disposal as a matter of law. Since the equipment is still capable of productive use, they argue, the seller is not responsible for the purchaser's independent decision to dispose of a useful product, rather than reuse it. The courts have generally rejected this *per se* rule, however, as inconsistent with the broad remedial purposes of CERCLA. *See e.g. State of New York v. General Electric Co.*, 592 F.Supp. 291, 297 (N.D.N.Y.1984) ("it is equally clear that a waste generator's liability under CERCLA is not to be so facially circumvented by its characterization of its arrangements as 'sales.'") "Even though a manufacturer does not make the crucial decision as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may [still] be liable," the court held, if the evidence indicates that it "intended to otherwise dispose of hazardous waste when [it] sold the transformers."

*Florida Power & Light Co.*, 893 F.2d at 1318, 1319.

The crucial inquiry, therefore, is the reasons for the transaction. *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 655, n. 3 (N.D.Ill. 1988), *aff'd on other grounds*, 861 F.2d 155 (7th Cir.1988). If a company sells equipment that contains hazardous substances to another company "for a purpose other than its disposal," it will not be liable for the costs that result from the purchaser's subsequent decision to dispose of the product after he uses it. *Prudential Insurance Co. v. United States Gypsum*, 711 F.Supp. 1244, 1254 (D.N.J.1989); *see also Aceto Agr. Chemicals Corp.*, 872 F.2d at 1381 ("Courts have, however, refused to impose liability where a 'useful' substance is sold to another party, who then incorporates it into a product, which is later disposed of.")

On the other hand, if a company sells equipment that contains hazardous substances in order to dispose of the product, he will be liable for the costs that result from that disposal even if the equipment is valuable and useable at the time of sale. Common sense dictates that if a company no longer needs a product and cannot find other companies to use it either, its only recourse is to dispose of the product and at least recover its scrap value. *See Florida Power & Light*, 893 F.2d at 1319 (The Court still examined the purpose of the sale even though the transformers were new when they were sold to the utility company.)

CERCLA imposes liability for the "disposal or treatment ... of hazardous *substances*," not just hazardous "*waste*." 42 U.S.C. § 9607(a) (emphasis added); *C.P. Holdings, Inc. v. Goldberg–Zoino & Associates, Inc.*, 769 F.Supp. 432, 437 (D.N.H. 1991); *Conservation Chemical Co.*, 619 F.Supp. at 239. As one district court explained:

*See Aceto Agr. Chemicals Corp.*, 872 F.2d at 1381.

---

**3.** The courts have generally rejected the argument, however, that the defendant must know where the hazardous substances are deposited.

[T]he explicit use of the word "substance" rather than the word "waste" is presumed to manifest a conscious choice of the legislators. In choosing "substance" over "waste" Congress demonstrated a desire to prevent a manufacturer of hazardous substances from one day disposing of its excess inventory and then arguing that since the "substances" had many other uses they were not "waste", and therefore no liability should attach.

*United States v. Farber*, 27 Env't Rep. Cases (BNA) 1978, 1981, 1988 WL 25427 (D.N.J., Mar. 16, 1988) (citing 126 Cong. Rec. 31,964 (December 3, 1980). Indeed, if a company decides to throw a product away, the product becomes "waste," and its condition prior to disposal largely becomes irrelevant.[4]

▨ In ascertaining the purpose of a particular transaction, the "courts have not hesitated to look beyond defendants' characterizations" and examine the other objective factors surrounding the sale in question. *See Aceto Agr. Chemicals Corp.*, 872 F.2d at 1381; *see also Conservation Chemical Co.*, 619 F.Supp. at 241 (rejecting the argument that the court must determine the purpose of a sale based solely on the defendant's viewpoint or intent); *General Electric Co.*, 592 F.Supp. at 297; *A & F Materials Co.*, 582 F.Supp. at 845. Regardless of their reasons, it is undisputed that all three defendants wanted to "get rid" of their used, surplus equipment. While each defendant made serious and aggressive attempts to market their equipment to companies that would use it,[5] they never placed any limitations on the future use of the product and they never inquired about the purchasers' intentions with respect to the product. *Compare C. Greene Equipment Corp.*, 697 F.Supp. at 986 (the company sold the transformers to a broker in used equipment, so the defendant clearly knew that the purchaser would arrange for the reuse of the product, and not disposal.) So long as the purchaser was the highest bidder and agreed to take the equipment away, the equipment was his with no questions asked. *See A & F Materials*, 582 F.Supp. at 845 ("The fact that [the seller's] decision to give the waste to [the purchaser] was governed by the marketplace (*i.e.* the highest bidder) is of no consequence.") Through these blind auction sales, the defendants were able to sell off more, if not all, of their surplus equipment, selling it to users, if possible, but to scrap dealers as well.

It is clear that if the defendants had known that Hirsch intended to scrap their equipment, rather than reuse it, they would be liable under CERCLA. *See Florida Power & Light Co. v. Allis Chambers Corp.*, 27 Env't Rep. Cases (BNA) 1558, 1559–1560, 1988 WL 167741 (S.D.Fla.1988), *aff'd*, 893 F.2d 1313 (11th Cir.1990) (utility company who sold used electrical transformers to a scrap dealer was liable under CERCLA); *see also Aceto Agr. Chemicals Corp.*, 872 F.2d at 1381 (discussing *Florida Power & Light*); *Shaner*, 1990 WL 115085, *4 (company who sold used car batteries to a scrap dealer was liable under CERCLA). Consequently, they cannot avoid this liability simply by keeping blinders on during the transaction. Any other interpretation of § 107(a)(3) would clearly frustrate the government's ability to hold the generators of hazardous waste accountable for the damages caused by its disposal. *See Aceto Agr. Chemicals Corp.*, 872 F.2d at 1382 ("Any other decision, under the circumstances of this case, would allow the defendants to simply 'close their eyes' to this method of disposal of their hazardous substances, a result contrary to the policies underlying CERCLA."); *United States v. Ward*, 618 F.Supp. 884, 895 (D.N.C.1985)

---

4. To the extent that other district courts have held that the good condition of the equipment is dispositive of this issue, this Court finds their reasoning unpersuasive. *See e.g. C. Greene Equipment Corp. v. Electron Corp.*, 697 F.Supp. 983 (N.D.Ill.1988).

5. Indeed, by selling the equipment to potential users, rather than scrap dealers, the defendants could obtain a much higher price. However, as the city of Cleveland discovered, when a potential user, like CEI, decides not to purchase the used transformers at that higher price, the only recourse is to sell the equipment to a scrap dealer.

("To give the statute [this] interpretation ... would allow generators of hazardous wastes to escape liability by closing their eyes to the method in which their hazardous waste is disposed of. This would encourage exactly the type of hazardous waste disposal that occurred here.")

Accordingly, this Court concludes that there are no genuine issues of material fact with respect to the liability of Owens, Navistar, and Cleveland and that the government is entitled to summary judgment on that issue as a matter of law.

### IV.

In sum, this Court now enters the following orders:

(1) The United States' motion for summary judgment against Summit Equipment Supplies, Benjamin Hirsch, Owens–Illinois, Navistar, and the City of Cleveland is granted;

(2) Michael Hirsch's motion for summary judgment against the United States is granted;

(3) The remaining defendants' motions for summary judgment against the United States are denied;

(4) The motion to strike the affidavit of Ralph Dollhopf is denied; and

(5) The United States' motion to strike affirmative defenses is denied as moot.

IT IS SO ORDERED.

### MEMORANDUM AND ORDER ON DENIAL OF RECONSIDERATION

#### September 13, 1992

The United States brings this action under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for recovery of costs incurred during a hazardous waste remedial action at the Summit Equipment Supplies, Inc. ("SES") facility in Akron, Ohio. Five primary defendants remain in the suit: SES, Benjamin Hirsch, Owens–Illinois, Inc. ("Owens"), Navistar Transportation Corporation ("Navistar"), and the City of Cleveland ("Cleveland").

The United States moved for summary judgment against all of these defendants, on the question of liability under CERCLA. Owens, Navistar, and Cleveland, in turn, moved for summary judgment against the United States on the same question. This Court granted the government's motion for summary judgment and denied the summary judgment motions of Navistar, Cleveland, and Owens. Navistar, Cleveland and Owens have moved for reconsideration of this decision and Navistar and Owens have moved for certification for interlocutory appeal under 28 U.S.C. § 1292(b). For the reasons stated below, defendants' motions for reconsideration are denied, and the motions for interlocutory appeal are granted.

In granting the United States' motion for summary judgment, this Court reached the following conclusions:

1) the condition of equipment prior to disposal is not dispositive of the issue of whether the sellers arranged for disposal or treatment under CERCLA § 107(a)(3); and

2) the seller's characterization of the sale is not dispositive of the issue of the purpose for the transaction. Rather, the Court will examine other objective factors surrounding the sale; and

3) if sellers sell with the knowledge that the buyer intends to scrap the item, the sellers are liable under CERCLA § 107(a)(3). A seller cannot avoid liability through willful blindness to the sale. A sale at a blind auction to the highest bidder that the seller knows will result in a sale for scrap is "arranging for disposal or treatment" under CERCLA § 107(a)(3).

This Court found all defendants liable under this interpretation of CERCLA. No new issues were raised in the motions for reconsideration. Therefore, defendants' motions for reconsideration are denied.

This Court grants defendants' motion for certification under 28 U.S.C. § 1292(b). Certification is appropriate where the order to be appealed involves (1) a controlling question of law, (2) as to which there is substantial ground for difference of opinion, and (3) immediate ap-

peal may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).

The opinion granting summary judgment resolved a controlling question of law. The order found all defendants liable. Substantial grounds for a difference of opinion with respect to the Court's holding is evidenced by the lengthy briefings by all parties, and by the lengthy opinion by this Court. Furthermore, immediate appeal will materially advance the ultimate termination of the litigation. Under the Court's holding, the defendants will have contribution claims against several third party defendants. If defendants position is upheld on appeal, the time, expense and inconvenience of adding the numerous third parties will have been wasted. Therefore, this Court certifies the order granting plaintiff's summary judgment motion for interlocutory appeal under 28 U.S.C. § 1292(b).

In sum, defendants' motions for reconsideration of the order granting plaintiff's summary judgment motion and denying defendants' summary judgment motions are denied. Navistar's, Owens' and Cleveland's applications for oral argument on their motions for reconsideration are denied. Navistar's and Owens' motions for certification under 28 U.S.C. § 1292(b) are granted.

IT IS SO ORDERED.