UNITED STATES of America, Plaintiff,

v.

Dale VALENTINE, Jim's Water Service, Inc., Phillips Petroleum Company, Inc., Texaco Refining and Marketing Inc., True Oil Company, Richard J. Wallace, Conoco Pipe Line Company, Eighty-Eight Oil Company, Valentine Construction Company, Inc., and William Valentine and Sons, Defendants.

No. 93–CV–1005–J.

United States District Court,
D. Wyoming.

April 25, 1995.
Nunc Pro Tunc Feb. 10, 1995.

Myles E. Flint, Anna C. Thode, Sarah D. Himmelhoch, Dept. of Justice, Washington, DC, Richard A. Stacy, U.S. Atty., Cheyenne, WY, Linda Kato, E.P.A., Denver, CO, David A. Kubichek, U.S. Attys. Office, Casper, WY, Joanne Callahan, E.P.A., Washington, DC, for U.S.

James W. Owens, James R. Bell, Murane & Bostwick, Casper, WY, Jon B. Huss, Brown & Drew, Casper, WY, Carl L. Lathrop, J. Kent Rutledge, Lathrop & Rutledge, Glenn E. Smith, Glenn E. Smith & Associates, Steven F. Freudenthal, Herschler, Freudenthal, Salzburg, Bonds & Rideout, Cheyenne, WY, John R. Vincent, Vincent & Vincent, Riverton, WY, for Dale Valentine.

Tom C. Toner, Yonkee & Toner, Sheridan, WY, David A. Bailey, William J. Duffy, Parcel, Mauro, Hultin & Spaanstra, Denver, CO, for Richard J. Wallace.

J.N. Murdock, Mark W. Gifford, Reeves, Murdock & Gifford, Casper, WY, Christopher J. Dodson, George A. Phair, Conoco Inc., Houston, TX, for Conoco Pipe Line Co.

John D. McCarthy, John L. Watson, Holme, Roberts & Owen, Denver, CO, Manuel A. Lojo, True Oil Co., Casper, WY, for Eighty–Eight Oil Co., True Oil Co.

H.W. Rasmussen, Badley & Rasmussen, Sheridan, WY, for Jim's Water Service Inc.

William M. McKellar, Boley & McKellar, Cheyenne, WY, Don Jemison, Elaine M. Allan, Phillips Petroleum Co. Inc., Bartlesville, OK, for Phillips Petroleum Co. Inc.

Edward W. Harris, Lynnette J. Boomgaarden, Holland & Hart, Cheyenne, WY, Anthony L. Joseph, Holland & Hart, Denver, CO, for Texaco Refining and Marketing Inc.

John D. McCarthy, John L. Watson, James W. Owens, James R. Bell, Murane &

Bostwick, Casper, WY, Jon B. Huss, Brown & Drew, Casper, WY, Carl L. Lathrop, J. Kent Rutledge, Lathrop & Rutledge, Glenn E. Smith, Glenn E. Smith & Associates, Cheyenne, WY, Chris A. Mattison, James W. Britt, Hall & Evans, Denver, CO, for Valentine Const. Co. Inc.

William Valentine and Sons Inc., Dale Valentine, Glenrock, WY, pro se.

### AMENDED ORDER NUNC PRO TUNC ON MOTIONS FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

The plaintiff's Motion for Partial Summary Judgment as to Liability and Days of Violation and defendant Jim's Water Service's Motion for Summary Judgment came before the Court for hearing October 18, 1994. Appearing at the hearing for the United States were Aleksander D. Radich, Sarah Himmelhoch and Michael Northridge; appearing for defendant Jim's Water Service was Harlan W. Rasmussen. The Court, having considered the motions, the materials filed in support of the motions and in response thereto, the arguments of counsel, and being fully advised in the premises, FINDS and ORDERS as follows:

### Background

Many of the facts giving rise to this case are described in prior orders of this Court. *See United States v. Valentine*, 856 F.Supp. 627 (D.Wyo.1994) and *United States v. Valentine*, 856 F.Supp. 621 (D.Wyo.1994) for much background information.

In those orders, this Court has determined previously that the Site near Glenrock, Wyoming posed an imminent and substantial endangerment at the time the administrative orders were issued, and continues to do so; that the EPA acted properly in issuing the administrative orders; and that due process rights of Jim's Water Service ("JWS") were protected by the opportunity to confer after the administrative orders were issued and by the opportunity to challenge the finding of liability during Phase II of this litigation.

In the motions presently under consideration by the Court, the United States seeks summary judgment as to the liability of JWS for violations of the administrative order issued by the Environmental Protection Agency ("EPA") on September 17, 1991 pursuant to the Resource Conservation and Recovery Act ("RCRA"). This motion also seeks judgment in favor of the United States that JWS has been in violation of the administrative orders for at least 1060 days. The United States asserts JWS has been out of compliance with the administrative order since JWS notified EPA that it did not intend to comply with the administrative order on September 27, 1991.

Defendant JWS claims it is not liable for cleanup of the imminent and substantial endangerment posed by conditions at the Site for a number of reasons. In part, defendant asserts that it did not have control over the handling, storage, treatment, transportation or disposal of solid and/or hazardous waste at the Site; that RCRA liability is limited to certain persons not including JWS; that the material sent to PRCP was not waste within the meaning of RCRA; that there is no nexus between JWS, the waste and the endangerment at the Site so as to cause JWS to be liable under RCRA; and finally, that JWS has not been afforded due process and must first be determined to be liable for Site cleanup in an administrative hearing or other judicial adjudication.[1]

The Site is comprised of approximately 32 acres of land surrounded by a low barbed wire fence. In the late 1970s, an oil reclaiming facility was constructed and operated at the Site by Dale Valentine, Valentine Construction Company, Inc., and Big Muddy Oil Processors, Inc. Certain equipment was installed and used at the Site, including underground and above-ground storage and treatment tanks, unlined disposal pits, a pump house, and underground piping system connecting tanks and pits. In 1988, Powder River Crude Processors, Inc. ("PRCP") entered into an agreement to purchase the assets of Big Muddy Oil Processors and attempted to restart the reclaiming business.

---

1. This Court has already considered JWS's due process arguments in the Phase I portion of this litigation. Those arguments will not be revisited in this Order or during the Phase II portion of the litigation.

In 1988, PRCP accepted over 5,300 barrels of oily wastes from various companies, including JWS and Texaco Refining and Marketing, Inc. PRCP attempted to treat some of the oily wastes at the Site, although most of the oily wastes brought to the Site were not treated at all. The loads of oily wastes that were brought into the Site contained bottoms, sediments, and water ("BSW"). Oil with BSW contents of more than 0.4% cannot be shipped through pipelines and is considered to be unmarketable within the petroleum industry. BSW removed from the oily wastes during PRCP's treatment processes was disposed of at the Site. Some of the BSW was spread on roads at the Site; some was disposed of in pits at the Site; and some was left in storage tanks, both above and below ground, also on the Site. After PRCP had been in operation only a few months, it began to run out of room for storage of BSW associated with the waste shipments. Transporters, including JWS, then began disposing of the water portion of the BSW in shipments directly into the pits before off-loading the potentially reclaimable wastes into the tanks.

JWS is a general oil field contractor that provides services to oil companies, including hauling and disposing of production water, supplying fresh water, constructing oil rigs, and performing roustabout work. JWS's facilities include disposal pits of its own outside of Gillette and Douglas. JWS trucks hauled production water from oil fields to these disposal pits. This production water contained chlorides, salts, and oil. Once disposed of in the JWS pits, the petroleum in the production water separates and forms a film on top of the disposal pits. This oily layer is skimmed off the disposal pits each summer. JWS places the skimmed oil into a storage tank at the disposal pit facility. These tanks also accept oily wastes skimmed at the pits of JWS's customers.

After the skimmed oil is placed in the tanks, JWS attempts to find a buyer for the oil. It often has difficulty disposing of this oil because it is high in BSW and is not good pipeline grade oil. Refiners will not accept the skimmed oil until it has been reclaimed. PRCP was one of the oil reclaiming facilities that would accept JWS's pit skimmings. JWS transported 325.75 gross barrels of pit skimmings to the Site from the disposal pits in Gillette during 1988. The materials were shipped to the Site for reclaiming. The percentage of BSW in the pit skimmings shipped from Gillette by JWS to PRCP was too high to allow JWS to sell the materials to a refinery or ship it down a pipeline before it was reclaimed. JWS was paid approximately $3.00 per barrel for these shipments of pit skimmings by PRCP. The market price for pipeline quality crude oil at the time was approximately $16.00 per barrel.

JWS also transported materials to the Site pursuant to its contract with Texaco. Texaco had begun closing its Evansville, Wyoming refinery in 1982, under an EPA supervised closure plan. In 1988, EPA advised Texaco that it intended to terminate the RCRA interim status that had previously allowed Texaco to operate a land farm in conjunction with Texaco's refinery operations. In August of 1988, Texaco entered into a contract with PRCP in which it agreed to deliver approximately 5,000 barrels of tank bottoms from the Casper, Wyoming refinery to PRCP. Tank bottoms are the bottom one foot of material in tanks at the closed refinery and contained BSW. PRCP was the only facility in Wyoming that would accept tank bottoms. Prior to this time, Texaco had disposed of the BSW portion from tank cleaning at its land farm or the materials were burned in the refinery's boiler.

The price to be paid by PRCP for the tank bottoms varied with the BSW content of the oil. If the BSW content was below 70%, PRCP paid Texaco. The amount PRCP paid Texaco was higher when the BSW content of the oil was lower. If the BSW content was higher than 70%, Texaco had to pay PRCP. The highest price paid by PRCP was for oil containing less than 5.1% BSW, which was $7.00 per barrel. The actual measurement of BSW content was conducted by PRCP employees using a centrifuge, which had been inspected by a Texaco employee who had indicated that the centrifuge was adequate.

On August 10, 1988, Texaco and JWS also entered into a contract which authorized JWS to furnish 130 barrel trucks to haul

liquid petroleum products from the Casper refinery to PRCP near Glenrock, Wyoming. Payment was to be based on the number of hours worked by each truck at the rate of $38.00 per hour.

When JWS employees first attempted to move materials from the Texaco tanks to JWS trucks for transportation to the Site, the lines from the tank to the truck became clogged. After that, all loads from the Texaco tanks were loaded into JWS trucks with a special device known as a "super sucker." It took at least twice as long to load the tanks bottoms as ordinary crude oil or regular production water would have taken to load. Altogether, JWS transported 5,251 barrels of waste from Texaco's refinery to the Site. Of these, 610 barrels had a BSW content greater than 70% for which Texaco was required to pay PRCP under the terms of the parties' agreement.

PRCP stopped operations in late 1988. It had accepted more than 5,000 barrels of oily waste, but sold little reclaimed oil. After PRCP stopped operations, over 8,800 barrels of oily waste remained at the Site.

In 1991, the EPA issued a number of administrative orders to parties who had contributed to conditions at the Site, including JWS. On September 17, 1991, the EPA issued an administrative order to JWS requiring JWS to secure the Site by installing a locked gate on the existing fence and posting warning signs within 10 days. It also required JWS to construct a security fence surrounding the Site, assess the integrity of tanks and impoundments containing wastes, implement any interim measures necessary to prevent releases, and consult with the Wyoming Game and Fish Department for additional wildlife protection measures with 30 days. Within 60 days, JWS was required to submit a workplan providing for the removal of all wastes at the Site, develop and begin implementation of a sampling program to determine the extent and nature of contamination of the groundwater, soil, subsurface, gas, air, surface water, and sediment at the Site. The administrative orders also required regular reports to the EPA, recording of a plat reflecting the extent and location of contamination, and the provision of access to state and federal authorities. The order required JWS to notify the EPA whether it intended to comply within ten days of receipt of the orders. JWS was also given an opportunity to confer with the EPA, if a request was submitted to the EPA within 10 days.

JWS notified the EPA on September 27, 1991 that it did not intend to comply with the administrative order. Although representatives of JWS visited the Site and made a single offer to pay towards the interim security measures performed by the Settling Defendants, JWS did not take any steps to actually clean up the Site.

## Standard of Review Motions for Summary Judgment

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party's burden may be met by identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether these burdens have been met, the court is required to examine all evidence in the light most favorable to the non-moving party. *Barber v. General Electric Co.*, 648 F.2d 1272 (10th Cir.1981).

Once the moving party has met its initial burden, the burden shifts to the party resisting the motion. That party must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Manders v. Oklahoma ex rel. Dept. of Mental Health*, 875 F.2d 263, 265 (10th Cir.1989) citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553–54.

## Discussion

### Resource Conservation and Recovery Act (RCRA)

RCRA was enacted in 1976 and was "an attempt by Congress to deal with problems posed by the general disposal of wastes in this country, as well as the particular problems associated with the disposal of hazardous substances." *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d 1373 (8th Cir.1989), reh. den. (1989). The act provides what "Congress has called a 'prospective cradle-to-grave regulatory regime governing the movement of hazardous waste in our society.'" *Id.*, quoting H.R.Rep. No. 1016, Part I, 96th Cong., 2d Sess. 17, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6120. *See also United States v. ILCO, Inc.*, 996 F.2d 1126, 1130 (11th Cir.1993), quoting *American Petroleum Institute v. EPA*, 906 F.2d 729, 732 (D.C.Cir.1990).

RCRA, Section 7003, 42 U.S.C. § 6973(a), provides:

Notwithstanding any other provision of this chapter, upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to the health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court against any person (including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility) who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal to restrain such person from such handling, storage, treatment, transportation, or disposal, to order such person to take such other action as may be necessary, or both. A transporter shall not be deemed to have contributed or to be contributing to such handling, storage, treatment, or disposal taking place after such solid waste or hazardous waste has left the possession or control of such trans-

porter if the transportation of such waste was under a sole contractural [sic] arrangement arising from a public tariff and acceptance for carriage by common carrier by rail and such transporter has exercised due care in the past or present handling, storage, treatment, transportation and disposal of such waste. The administrator shall provide notice to the affected State of any such suit. The Administrator may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and the environment.

 RCRA is a remedial statute which is to be liberally construed. *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d at 1383; *Lincoln Properties, Ltd. v. Higgins*, 23 Envtl.L.Rep. 20665, 20669, 1993 WL 217429 (E.D.Cal.1993). RCRA imposes strict liability on any person, including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to such handling, storage, treatment, transportation or disposal of waste. The elements of a claim in which the plaintiff seeks injunctive relief under RCRA, Section 7003(a), are three:

1) That the conditions at the site may present an imminent and substantial endangerment;

2) That the endangerment stems from the handling, storage, treatment, transportation or disposal of any solid or hazardous waste; and

3) That the defendant has contributed or is contributing to such handling, storage, treatment, transportation or disposal.

*Lincoln Properties v. Higgins*, 23 Envtl. L.Rep. at 20670; *United States v. Bliss*, 667 F.Supp. 1298, 1313 (E.D.Mo.1987); *United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 197–201 (W.D.Mo.1985) (setting out three elements for RCRA liability).[2] Further:

*United States v. Valentine*, 856 F.Supp. 627 (D.Wyo.1994) and *United States v. Valentine*, 856 F.Supp. 621 (D.Wyo.1994). The law of the case

---

**2.** The first two elements have already been established during the Phase I portion of this case and have now become the law of the case. *See*

Section 7003(a) of RCRA imposes liability without fault or negligence and applies to present conditions resulting from the past activities of past off-site generators and transporters. [*United States v.*] *NEPAC-CO*, 810 F.2d [726] at 740 [ (8th Cir.1986) ]. Liability is not limited to generator transporters but includes any person who contributed to improper disposal. *See* H.R.Rep. No. 1133, 98 Cong., 2d Sess., 130 Cong.Rec.H. 11137 (October 3, 1984); S.Rep. No. 172, 96th Cong., 2d Sess. 5 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 5019, 5023 ("contributing to" more liberal than common law liability); *Price*, 523 F.Supp. at 1073.

*United States v. Bliss*, 667 F.Supp. at 1313.

In this case, JWS argues that it is not a party who may be found liable under RCRA because it was operating pursuant to contract with Texaco and because the complaint was not sufficient to allege liability against JWS as a generator. This Court does not find the arguments asserted by JWS to be persuasive.

■ As noted above, RCRA liability is not limited to generators and transporters of solid or hazardous wastes, but also includes persons who have contributed to or are contributing to the handling, storage, treatment, transportation or disposal of solid or hazardous waste. Contrary to the assertions of JWS, it is not necessary that a party have control over the ultimate decisions concerning waste disposal or over the handling of materials at a site in order to be found to be a contributor within the purview of RCRA. *United States v. Aceto Agric. Chemicals Corp.*, 872 F.2d at 1383–84.

■ This Court is also not persuaded when JWS argues that it may only be liable under RCRA if it actually selected the site or disposal facility. JWS relies on authority and statutory language applicable to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Under specific CERCLA provisions, transporters may be liable if they selected the particular site for disposal of hazardous

substances. *See e.g., United States v. Hardage*, 750 F.Supp. 1444, 1458 (D.Okla.1990), citing 42 U.S.C. § 9607(a)(4) (Supp. V 1987) and *United States v. South Carolina Recycling & Disposal, Inc.*, 653 F.Supp. 984, 1005 (D.S.C.1984), aff'd in part, vacated in part on other grounds sub nom. *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), cert. den., 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). RCRA contains no such limitations on transporter liability, and instead provides that persons who have contributed to or are contributing to the handling, storage, treatment, transportation or disposal of solid or hazardous waste are liable under RCRA. [*See also Tippins, Inc. v. USX Corp.*, 37 F.3d 87 (3d Cir.1994), for further discussion of transporter liability under CERCLA; finding transporter liable under CERCLA even though it did not make final decision to select disposal site where transporter had substantial input into the disposal decision by locating and submitting a limited number of potential disposal sites from which the generator then selected.]

The facts alleged in this case, as set out in the foregoing portions of this Order, are more than sufficient to find JWS was a contributor to the handling, storage, treatment, transportation or disposal of solid or hazardous waste within the meaning of RCRA. Contrary to the arguments JWS raises that rely on *Zands v. Nelson*, 779 F.Supp. 1254, 1264 (S.D.Calif.1991), JWS is not "so far removed" that it can be determined as a matter of law that JWS is not a contributor, as contemplated by RCRA. Furthermore, JWS has an opportunity in the Phase III portion of this litigation to pursue defenses asserting that JWS was acting solely pursuant to the terms of its contract with Texaco when it delivered materials to the Site from the Texaco refinery and was without control or authority over these waste disposal decisions.

■ This Court also disagrees with the argument raised by JWS that the complaint filed originally by the United States was not

doctrine is one which directs a court's discretion; it is not a limitation upon a tribunal's power. *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). The

doctrine "posits that when a court decides upon a rule of law that decision should continue to govern the same issues in subsequent stages in the same case." *Id.*

sufficient to allege generator liability against JWS under RCRA. JWS has participated fully in the discovery process. It had knowledge that the allegations against JWS arise at least in part from its own activities as a generator of wastes disposed of at the Site near Glenrock. Paragraph 22 of the Amended Complaint alleges "[b]etween 1978 and 1989, Conoco, Eighty–Eight, Phillips, Texaco, Burlington, Jim's Water Service, Inc., and True generated oily wastes and sent them to the Site."

■ Once a complaint has been amended, the original complaint filed prior to being amended is no longer before the court. The Amended Complaint in this case was filed September 1, 1994. That amended complaint contains the only allegations and causes of action that are now relevant to this Court. *See Zands v. Nelson,* 779 F.Supp. at 1258, citing [cf.] *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409–10 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Defendant JWS's argument that the amended complaint is not sufficient to allege RCRA liability as a generator is without merit.

■ JWS urges that the claim the United States, has asserted against it based upon the sales of crude oil (materials from JWS's Gillette facility) must fail. JWS argues that the EPA has not elected to regulate the activities of companies engaged in either exploration or production of oil. JWS contends that the oil it sold to PRCP was virgin crude oil which could be sold to reclaimers, although it would have required further reclamation for removal of BSW. This Court does not find the characterization of these particular transactions as "sales" of virgin crude oil to be dispositive.

Under RCRA, one of the relevant inquiries is whether the materials subject to regulation are solid or hazardous wastes. RCRA defines "solid waste" as:

> ... any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges, which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

42 U.S.C. § 6903(27) (1983 & Supp.1994).

"Discarded material" is not defined in the statute, but in the Code of Federal Regulations, at 40 C.F.R. § 261.2(a)(2), it is defined as any material that is abandoned. 40 C.F.R. § 261.2(b) provides that materials are solid wastes if they are "abandoned" by being "disposed" of. 42 U.S.C. § 6903(3) defines "disposal" to mean:

> ... the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

Central to the thesis advanced by JWS is the notion that the materials it sold to PRCP are not discarded materials, simply because they were sold or, alternatively, because they continued to be useful products, even though they may not have been useful to JWS. This argument is not persuasive and has been rejected by other courts that have considered the same argument. In *Zands v. Nelson,* 779 F.Supp. at 1262, the court stated:

> The fact, however, that a product may at one time in the past be useful is of no benefit to those trying to avoid this statute [RCRA] once the product's usefulness lapses. As a result, defendants may be correct in one sense when they argue that "gasoline" is excepted from this section because it is not a solid waste. Despite any negative effects on the environmental system, gasoline is a useful product. Indeed, in the present situation, the intention in placing the gasoline into the underground tank was that it would be subsequently taken out of the tank and sold.

It is equally clear, however, that gasoline is no longer a useful product after it leaks into, and contaminates, the soil. At this point, the gasoline cannot be reused or recycled. As a result, it must be said that the gasoline has been abandoned via the leakage (even if unintentional) into the soil. Indeed, the Court is of the opinion that by including the word "leaking" in its definition of the word "disposed," the statute incorporates this change in usefulness.

*Zands v. Nelson*, 779 F.Supp. at 1262. *See also United States v. Summit Equipment & Supplies, Inc.*, 805 F.Supp. 1422, 1431 (N.D.Ohio 1992) (CERCLA; sellers of used, surplus equipment at blind auction sales were liable as generators of hazardous substances, even if they did not know that the purchaser intended to scrap the equipment rather than reusing it.).[3]

The crucial inquiry, therefore, is the reasons for the transaction.... If a company sells equipment that contains hazardous substances to another company "for a purpose other than its disposal," it will not be liable for the costs that result from the purchaser's subsequent decision to dispose of the product after he uses it.... On the other hand, if a company sells equipment that contains hazardous substances in order to dispose of the product, he will be liable for the costs that result from that disposal even if the equipment is valuable and useable at the time of sale. Common sense dictates that if a company no longer needs a product and cannot find other companies to use it either, its only recourse is to dispose of the product and at least recover its scrap value....

*United States v. Summit Equipment & Supplies, Inc.*, 805 F.Supp. at 1431 (citations omitted). *Cf. Catellus Dev. Corp. v. United States*, 34 F.3d 748 (9th Cir.1994) (CERCLA).

In this case, it is clear that JWS intended to rid itself of a disposal problem when it sold its pit skimmings to PRCP, who apparently intended to use the pit skimmings in a further reclamation process. JWS recovered the cost of skimming the oil from its own disposal pits when it sold the wastes to PRCP for approximately $3.00 per barrel. *See e.g.,* J. Rodgers Deposition at 20–22. This is a case where common sense dictates that the company's best recourse was to dispose of the pit skimmings that had no further value to JWS and attempt to recover at least the cost of skimming.

There is no genuine dispute of material fact that JWS disposed of materials at the Site, notwithstanding its attempt to characterize the disposition of materials as a sale of virgin crude oil. This Court has determined previously that wastes disposed of at the Site have contributed to the substantial and imminent endangerment to human health and the environment. JWS is liable under RCRA, Section 7003, both as a transporter and as a generator of solid waste.

In Phase III of this litigation, JWS may raise issues concerning the work it performed for Texaco pursuant to contract, including its claims for indemnification and/or contribution. Stated differently, in Phase III of the litigation, JWS may pursue its argument that Texaco is responsible for all of the materials at the PRCP site which originated at the Texaco Refinery and were transported to PRCP by JWS pursuant to contract.

■ The Court must also determine in this Phase II portion of the litigation whether the defendant, JWS, had an objectively reasonable belief upon which to challenge the administrative orders issued by the EPA in this case prior to the imposition of civil penalties. The standard for challenging these orders where neither the statute [RCRA], applicable EPA regulations or policy statements provide guidance as to the validity or applicability of an EPA order is described in *United States v. Jobgen*, 19 Envtl.L.Rep. 20897, 1989 WL 418575 (D.S.D.1989) [quoting from *Solid State Circuits, Inc. v. United States Environmental Protection Agency,*

---

**3.** We rely on authority discussing CERCLA in this context as it provides a useful analogue. Here, and in many other instances, CERCLA and RCRA are not significantly different, as contrasted to the situation noted on pages 13 and 14 above distinguishing between CERCLA's statutory provisions related to transporter liability if the transporter selected a particular site for disposal of hazardous substances.

812 F.2d 383 (8th Cir.1987) ] [in the CERCLA context]:

> Thus, we hold that if neither CERCLA nor applicable EPA regulations or policy statements provide the challenging party with meaningful guidance as to the validity or applicability of the EPA order, *Ex Parte Young* and its progeny require that the burden rest with the EPA to show that the challenging party lacked an objectively reasonable belief in the validity or applicability of a cleanup order. *Id.* at 392.

*United States v. Jobgen,* 19 Envtl.L.Rep. at 20897.

Here, JWS does not dispute that it failed to comply with the EPA's administrative order. It does argue that it has an objectively reasonable good faith belief that it was not required to comply with the administrative order after it was issued by the EPA. JWS asserts that, because it acted upon the advice of counsel and its consulting engineer, Larry Baccari, it reasonably believed the administrative order was not valid and that it had not contributed to any imminent and substantial endangerment at the Site.

JWS also argues that its refusal to comply was objectively reasonable because allegations concerning the sale of materials by JWS to the Site were not included in the EPA order when it decided not to comply with the administrative order. Although counsel and the engineer believed that JWS had done nothing "wrong," they may have failed to account for the fact that the RCRA statutory scheme imposes strict liability upon past and present contributors, as well as past and present transporters and generators of hazardous or solid waste. The statutory language employed by Congress is broad and is intended to abate conditions resulting from past activities without regard for fault or negligence. *United States v. Conservation Chem. Co.,* 619 F.Supp. at 198.

The United States disputes JWS's contentions and argues that JWS did not have a reasonable good faith belief that it was not obligated to comply with the EPA's administrative order. The United States notes that the only individual responsible for deciding whether JWS should comply with the order was Mr. Rodgers, the company's president and one of two shareholders. The United States cites to deposition transcript excerpts in which Mr. Rodgers testified that he was told by counsel that "I'm guilty under this act and guilty under this act and if that's not good enough I'm guilty under this act and I'm guilty under that act[ ]" and that he "knew [he] couldn't win" if the case was brought to court. These excerpts are somewhat ambiguous and do not clearly disclose to the Court's satisfaction whether JWS had an objectively reasonable good faith belief that it was not required to comply with the administrative order.

The United States also argues that JWS did not engage in any investigation of the facts or JWS's involvement at the Site, that Mr. Rodgers did not disclose to his counsel that JWS drivers had disposed of materials directly into pits at the Site, and that no one on behalf of JWS ever searched JWS's files or spoke with JWS drivers in an effort to obtain more information about what had actually happened at the Site. The United States argues that, although JWS believed it had no defense to the administrative order, it nonetheless refused to comply with the administrative order and continues to remain out of compliance today. The United States concludes, therefore, that it is entitled to summary judgment that JWS contributed to the handling, storage, transportation, treatment, and disposal of a solid waste that is giving rise to an imminent and substantial endangerment at the Site and that JWS has been in violation of the administrative order for more than a thousand days, or since September 27, 1991 when JWS advised the EPA that it did not intend to comply with the administrative order.

■ This Court believes that there is a genuine factual dispute precluding summary judgment as to whether JWS had an objectively reasonable good faith belief that it was not required to comply with the administrative order issued to it by the EPA in September of 1991. RCRA, applicable EPA regulations and policy statements, as well as existing case authority, provide meaningful guidance as to the validity or applicability of the EPA order, as discussed more fully above in

this order. Consequently, the burden of proving the objective reasonableness of JWS's challenge to the EPA's administrative order remains with JWS. *See Solid State Circuits, Inc. v. United States Environmental Protection Agency,* 812 F.2d at 391–392.

Further, there is no evidence in the record before the Court which would permit it to make any findings whatsoever as to the amount of civil penalty, if any, that would be appropriate. The United States asserts that Section 7003(b) of RCRA, 42 U.S.C. § 6973(b), permits the imposition of civil penalties up to $5,000 per day for each day of violation of the administrative order. This Court has already determined that there is a genuine factual dispute precluding summary judgment as to whether JWS had an objectively reasonable good faith belief that it was not required to comply with the administrative orders from September 27, 1991. Further, because there is also no evidence before the Court concerning an appropriate penalty for such violation, if a penalty is indeed appropriate, summary judgment as to that issue is also inappropriate. Accordingly, summary judgment as to the amount of civil penalty that should be imposed against JWS, if any, pursuant to Section 7003(b) of RCRA shall not be granted in favor of the United States for the reason that there are genuine issues of material fact that remain for trial.

Finally, this Court shall summarily reject the arguments advanced by JWS concerning common carrier by rail exemption provided for in the RCRA statute. The deposition testimony in the record before the Court, including that of Mr. Jimmie Rodgers, clearly indicates that JWS was not a common carrier and that JWS was instead a contract carrier. *See* Deposition of J. Rodgers. The Court need not address this argument further and declines the invitation to consider any related constitutional arguments.

Accordingly, and for the foregoing reasons, it is hereby

**ORDERED** that the motion for partial summary judgment by the United States seeking judgment against JWS as to liability and days of violation, pursuant to RCRA Section 7003 shall be, and is, **GRANTED in part.** It is further

**ORDERED** that the motion for summary judgment by the defendant Jim's Water Service shall be, and is, **DENIED.** It is further

**ORDERED** that summary judgment shall be **DENIED** with respect to issues as to whether JWS had an objectively reasonable good faith belief that it was not required to comply with the administrative order and as to the amount of civil penalty, if any, that may be imposed against Jim's Water Service for violating the administrative order. **The parties shall be prepared to proceed to trial on these issues on the date presently set for trial, February 27, 1995 at 1:30 p.m. in Cheyenne, Wyoming.**